Scot and Kathy **BURKE**, Appellants–Plaintiffs,

v.

**Blachly Tabor BOZIK and Hartman**, Appellee–Defendant.

No. 45A04–0303–CV–105.

Court of Appeals of Indiana.

Nov. 26, 2003.

Publication Ordered Jan. 23, 2004.

Robert E. Stochel, Hoffman & Stochel, Crown Point, IN, Attorney for Appellants.

Gilbert F. Blackmun, Blackmun Bomberger Moran & Tyler, Highland, IN, Molly J. Moran, Pro Hac Vice, Jenner & Block, LLP, Chicago, IL, Attorneys for Appellee.

## OPINION

FRIEDLANDER, Judge.

Scot and Kathy Burke (the Burkes) filed a Complaint for Declaratory Judgment on October 23, 2000, seeking a determination of rights under a November 17, 1997 employment agreement (the Agreement), entered into between the Burkes and Blachly, Tabor, Bosik and Hartman (the Law Firm). Under the Agreement, the Burkes retained the Law Firm to represent them against claims asserted by heirs of Harold Meyer, Kathy Burke's great-uncle, relating to a trust Meyer had created in 1990 naming the Burkes as sole beneficiaries. The Agreement provided that the Law Firm would be paid on a contingent-fee basis. The Burkes' complaint against the Law Firm sought: (1) a determination that the Burkes did not owe the Law Firm attorney's fees, and (2) the withdrawal or release of an attorney's lien filed by the Law Firm on proceeds the Burkes were to receive from the then-pending litigation with Meyer's heirs. The Law Firm filed an answer and counter complaint seeking a judgment for attorney's fees based on the Agreement as well as the costs and expenses incurred by the Law Firm on behalf of the Burkes.

Both the Burkes and the Law Firm filed for summary judgment in July 2002. The trial court denied both motions, finding disputed factual issues. After a three-day bench trial in January 2003, the trial court entered judgment for the Law Firm in the amount of $349,782.45.[1] The Burkes appeal from that judgment. The following issues are consolidated for review:

1. Was the denial of the Burkes' Motion for Summary Judgment proper?

2. Were the trial court's findings of fact and conclusions of law supported by the evidence?

3. Was the trial court's interpretation of the Agreement reasonable?

We affirm.

The facts most favorable to the judgment demonstrate that in February 1990, Meyer created the Harold G. Meyer 1990 Trust (the Trust), the corpus of which was comprised of 38,200 shares of stock in

---

1. On the third day of trial, the Burkes paid $13,137.61 to the Law Firm, plus interest, representing the costs and expenses advanced by the Law Firm in defending the Burkes. Costs and expenses are not at issue in this appeal.

Calumet National Bank, now known as Bank Calumet. Upon Meyer's April 1997 death, the Trust terminated and its assets, valued between seven- and eight-million dollars, were to be distributed to the Burkes as the sole beneficiaries. Soon thereafter, the Burkes requested Bank Calumet, also trustee of the Trust, to transfer and convey ownership of the Bank Calumet stock to Kathy Burke. Due to litigation threats from Janet Cleland, Meyer's only child, and her children, however, Bank Calumet refused. The Law Firm participated in meetings with the Burkes and Bank Calumet regarding these issues.

Cleland and her children eventually filed suit in probate court against the Burkes and the Trust claiming undue influence and mental incapacity (the Cleland Litigation). To defend their interests in the Cleland Litigation, the Burkes retained the Law Firm to represent them on a contingency-fee basis. After several months of negotiations, the Law Firm and the Burkes executed the Agreement containing an early termination clause—the focus of the instant dispute—which stated:

> If the Attorney/Client relationship is terminated by us prior to the conclusion of these legal matters for reasons other than the law firm's failure to diligently pursue these legal matters, the law firm shall receive from the Burkes (40%) of the dividends to which Burkes [sic] are entitled from September 1997 through to the date of dismissal. Since payment of the dividends may be stayed by the Court, the funds shall be paid only when clients receive such dividends, even if said date is after the date of dismissal.

*Appellants' Appendix* at 5.

From July 1997 through May 15, 2000, four of the Law Firm's attorneys devoted substantial time to the Cleland Litigation including performing legal research, attending hearings, preparing pleadings, requesting and responding to discovery, attending more than fourteen depositions, as well as taking two interlocutory appeals, one of which concerned a matter of first impression before this court. *See Matter of Estate of Meyer,* 702 N.E.2d 1078 (Ind. Ct.App.1998). The Law Firm subsequently filed for summary judgment on behalf of the Burkes in the Cleland Litigation, and the Cleland family cross-claimed for summary judgment.

On February 22, 2000, Thomas Macke, a partner of the Law Firm, represented the Burkes at the summary judgment hearing in the Cleland Litigation. During the hearing, Scot Burke, who is also an attorney, directed Macke to dispute certain facts presented by the Cleland family that Scot believed were inaccurate. Macke felt it would be tactically unwise to argue facts at a summary judgment hearing and did not follow Scot's suggestion. Immediately after the hearing, the Burkes phoned Randy Zromkoski, a partner of the Law Firm and friend of the Burkes who had originally recommended them to the Law Firm. The Burkes expressed anger and disapproval at Macke's handling of the summary judgment hearing and repeatedly stated to Zromkoski that the Law Firm was "fired." *Transcript* at 191. Zromkoski told Macke about his conversation with the Burkes, including his belief that the Law Firm had been fired, shortly after Macke's return from the summary judgment hearing. The same day, the Burkes faxed a letter to Macke, with Zromkoski carbon-copied, stating:

> Due to your firms [sic] lack of preparation for today's hearing on Summary Judgment, your unsolicited false admissions on my behalf and your subsequent avoidance of repeated phone calls to your office, PLEASE HALT ANY FURTHER WORK on our case, and forward any court documents, corre-

spondences and telephone messages to my office at the above stated address, until further notice.

*Appellants' Appendix* at 16 (emphasis in original).

On February 24, 2000, the Burkes and Macke arranged a telephone conference regarding the status of the Law Firm's representation of the Burkes. The Burkes expressed extreme displeasure with the Law Firm's handling of the summary judgment hearing. Kathy Burke became verbally abusive, including the use of obscenities, when Macke disagreed with Scot's opinion of how the summary judgment hearing should have been handled. Based on Macke's conversation with Zromkoski, as well as the February 22, 2000 letter from the Burkes, Macke informed the Burkes that he believed the Law Firm had been terminated. Macke further stated that if the Burkes wished the Law Firm to undertake any action on their behalf they would have to so inform the Law Firm in writing.

Thereafter, the Burkes wrote a letter to Patrick Lyp, a partner of the Law Firm, on February 28, 2000, directing the Law Firm to prepare a reply brief regarding a motion to strike an affidavit and stating: "the [February 22, 2000] letter recently sent was not designed to terminate your relationship at this time, since termination of the relationship prior to any ruling on Summary Judgment would be counter productive [sic]." *Appellants' Appendix* at 158. The letter further stated:

> Please advise us of any contacts by opposing counsel, receipt of pleadings or letters, prior to you taking any action on those letters, conversations or responses, so that I can determine whether we

are proceeding in a manner I wish, and not simply the manner pre determined [sic] by your firm.

*Id.* at 159. On March 13, 2000, the Law Firm, through its senior partner, Duane Hartman, responded to the Burkes' February 28 letter:

> Given the apparent difference of opinion as to the manner in which this case is to be litigated as well as the tenor of your conversations with various members of this firm, it is abundantly clear that the attorney-client relationship between this firm and you has degenerated to a point where further representation is no longer appropriate.

*Id.* at 17. As a practical matter, the Law Firm proposed continuing as counsel of record until the trial court's ruling on the pending summary judgment motion and withdrawing ten days thereafter.

On May 2, 2000, the trial court granted the Burkes' Motion for Summary Judgment in its entirety. On May 15, 2000, Scot Burke directed the Law Firm by letter to "withdraw your appearance immediately." *Appellants' Appendix* at 18.

The Cleland family appealed the summary judgment ruling, which this court affirmed in part and reversed in part. *See In re Estate of Meyer,* 747 N.E.2d 1159 (Ind.Ct.App.2001), *trans. denied.* On remand, and as the Cleland Litigation proceeded, the Burkes filed a Motion for Recovery of Costs stating they had "incurred attorneys fees and costs in a sum not less than $300,000 in defending the frivolous and groundless claims of the Clelands with respect to the issue of undue influence." *Appellee's Appendix* at 40–41.[2] Addition-

---

2. In addition to the attorney's fees owed to the Law Firm, the Burkes subsequently hired new counsel via a $70,000.00 flat, contingent-fee arrangement, i.e., new counsel would be

paid $70,000.00 should the Burkes prevail in the Cleland litigation. The Law Firm had previously filed a lien against the Trust in October 2000 for $240,000.00—the Law

ally, the Burkes used their outstanding attorney's fees as a negotiating tool when they settled their dispute with the Cleland family on April 9, 2002. The settlement awarded the entire corpus of the Trust to the Burkes.

On October 27, 2002, the Burkes filed their Complaint for Declaratory Judgment and the Law Firm filed its Answer and Counter Claim for attorney's fees and costs. Both parties moved for summary judgment. The Law Firm argued that pursuant to the early-termination provision of the Agreement, upon settlement of the Cleland Litigation on April 9, the Burkes were obligated to pay the Law Firm 40% of the dividends received from the Bank Calumet stock from September 1997 through May 2000, the date of the Law Firm's withdrawal. During that time period, Peoples Bank, the successor trustee of the Trust, received a total of $825,436.00 in dividends on behalf of the Burkes. The trial court denied both motion for summary judgment. The trial court also denied the Burkes' Motion to Certify Matter for Interlocutory Appeal regarding the summary judgment ruling.

At trial in January 2003, the Burkes argued they did not terminate the Law Firm but rather the Law Firm withdrew against their wishes and therefore the early-termination provision was inapplicable. Alternatively, the Burkes claimed that even assuming they owed the Law Firm attorney's fees, under the terms of the Agreement the Law Firm was entitled to $0.00 since the Burkes received no Bank Calumet dividends between September 1997 and May 2000. Here, the Burkes' argument derived from the fact that during probate of Meyer's estate, the Burkes

and the Cleland family agreed to borrow money from Peoples Bank to pay the over five-million dollar inheritance and estate taxes owed by the Trust. The Burkes pledged the Bank Calumet stock dividends to pay the interest on that loan. Consequently, the Trust's Bank Calumet dividends went directly to Peoples Bank, at the Burkes' direction, rather than to the Burkes. In light of this arrangement, the Burkes argued that since they did not actually receive any dividends during the relevant period, 40% of $0.00 is $0.00, and under the early-termination provision, the Law Firm was entitled to $0.00. After a three-day bench trial, the trial court ruled in favor of the Law Firm and awarded $330,171.00—40% of the Bank Calumet dividends the Burkes were entitled to from September 1997 to May 2000.[3]

On appeal, the Burkes contend that the trial court improperly denied their summary judgment motion because neither party designated issues of material fact. Additionally, the Burkes claim that several of the trial court's findings were clearly erroneous, in particular: (1) the Burkes were obligated to pay death taxes; (2) the Burkes were entitled to the Bank Calumet dividends; (3) the Burkes were the parties that terminated the Law Firm; and (4) the calculation of dividends owed to the Law Firm as attorney's fees. Finally, the Burkes claim that the trial court's interpretation of the Agreement was unreasonable and resulted in an unconscionable award.

1.

■  The Burkes contend that the trial court improperly denied their July 1, 2002 summary judgment motion. In reviewing

Firm's estimate of the dividends received by the Burkes from the Trust during the relevant period.

**3.** Combined with 8% prejudgment interest from April 9, 2002—the date the Cleland Litigation settled—the total amount of the award was $349,782.45.

an appeal from the denial of a motion for summary judgment, we apply the same standard applicable in the trial court. *State v. Snyder,* 732 N.E.2d 1240 (Ind.Ct. App.2000). Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C). We therefore must determine whether the record reveals a genuine issue of material fact and whether the trial court correctly applied the law.

"A genuine issue of material fact exists where facts concerning an issue, which would dispose of the litigation are in dispute, or where the undisputed material facts are capable of supporting conflicting inferences on such an issue." *Bd. of Trs. of Ball State Univ. v. Strain,* 771 N.E.2d 78, 81 (Ind.Ct.App.2002). For summary judgment purposes, a fact is material if it bears on the ultimate resolution of relevant issues. *Yin v. Soc'y Nat'l Bank Indiana,* 665 N.E.2d 58 (Ind.Ct.App.1996). Any doubt as to the existence of an issue of material fact, or an inference to be drawn from the facts, must be resolved in favor of the nonmoving party. " 'Even if it appears that the nonmoving party will not succeed at trial, summary judgment is inappropriate where material facts conflict or undisputed facts lead to conflicting inferences.' " *Kreighbaum v. First Nat'l Bank & Trust,* 776 N.E.2d 413, 419 (Ind. Ct.App.2002) (quoting *Link v. Breen,* 649 N.E.2d 126, 128 (Ind.Ct.App.1995)). "The party appealing the trial court's grant or denial of summary judgment has the burden of persuading this court that the trial court's decision was erroneous." *City of New Haven v. Chem. Waste Mgmt. of Indiana,* 701 N.E.2d 912, 922 (Ind.Ct.App. 1998).

In the instant case, in their respective motions for summary judgment neither party disputed the Agreement's terms or the underlying facts of the dispute. The parties vigorously contested, however, the material and decisive factual issue of which party had terminated the Agreement and if the early-termination provision of the Agreement applied. Similarly, while the parties agreed that Bank Calumet dividends from the Trust were routed to Peoples Bank as interest payments on the over five-million dollar death tax loan, the parties fervently disagreed about whether the Burkes were "entitled" to the dividends for purposes of calculating attorney's fees under the Agreement's early-termination provision. The parties designated correspondence and affidavits to support their respective positions, and, using underlying undisputed facts, drew opposing inferences. The dispute therefore required a fact-finder to weigh the evidence and assess the credibility of the parties and witnesses. Because the undisputed facts supported conflicting inferences regarding a dispositive material issue, the trial court's denial of summary judgment was appropriate.

2.

The Burkes also contend that the trial court's findings of fact were unsupported by the evidence and its conclusions of law were unsupported by its findings of fact. Specifically, they argue the trial court erred in finding that they were personally obligated to pay death taxes, that they were entitled to the Bank Calumet dividends, and that they terminated the Law Firm. In addition, the Burkes argue that the trial court improperly calculated the dividends that the Law Firm was entitled to as attorney's fees.

Our review of a trial court's findings of fact and conclusions of law is two-tiered. First, we determine whether the evidence supports the trial court's findings, and second, if the findings support the judgment. *Int'l Health & Racquet Club, Inc.*

*v. Scott,* 789 N.E.2d 62 (Ind.Ct.App.2003). We will not disturb the trial court's findings or judgment unless they are clearly erroneous, namely, the record lacks any reasonable inference from the evidence to support them. A judgment is clearly erroneous when our review of the record leaves us with the firm conviction a mistake was made. In our review, we will neither reweigh evidence nor judge the credibility of witnesses, but will consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom. *Id.*

Regarding the death-tax obligation and dividend issues, at trial, the Law Firm presented testimony from Richard Rupcich, a trust and estates attorney and partner of the Law Firm. In addition to practicing law, Rupcich taught classes on federal estate and gift tax and estate planning at Valparaiso Law School for ten years, and led ICLEF seminars on the subject. Rupcich testified that inheritance and estate taxes arising from the Trust must ultimately be paid by those with a beneficial interest in the Trust, namely, the Burkes. Stephen Ziemba, a Trust Officer for Peoples Bank, testified that the Burkes were the sole beneficiaries of the Trust. Additionally, Nick Katich, an attorney for successor trustee Peoples Bank and a witness for the Burkes, testified that as the sole beneficiaries the Burkes

were entitled to the assets of the Trust, including any dividends or earnings arising from the Trust.[4] Based on the foregoing, the evidence supported the trial court's findings that the Burkes were the sole beneficiaries of the Trust, obligated to pay the death taxes and entitled to receive the Bank Calumet dividends. Consequently, the Burkes' decision to use the dividends to pay the death tax loan did not change their entitlement to the dividends for purposes of the early-termination provision. We refuse the Burkes' invitation to close our eyes to the reality of the situation. The evidence supported the trial court's findings and resulting judgment.

■ The Burkes also contest the trial court's finding that they were "the parties that terminated the contract between themselves and the [Law Firm], and the firm appropriately only withdrew its representation when doing so would not cause harm to its clients (or former clients) the Burkes." *Appellants' Appendix* at 11–12. The trial court based this finding on the Burkes' conversation with Zromkowski immediately following the summary judgment hearing where Kathy Burke repeatedly stated that the Law Firm was "fired," as well as the February 22, 2000 letter sent by the Burkes to Macke and Zromkowski ordering the Law Firm to halt all work on the case.[5] Based on this

---

**4.** The Burkes emphatically argue that the trial court's findings regarding their relationship to the Trust and their consequent obligation to pay death taxes is a "fundamental legal error" and "[i]t is simply ridiculous to argue that a party can be named as a beneficiary of a trust without his knowledge or acquiescence and then ultimately be held liable for the Trusts' debts and obligations simply because he is named a beneficiary." *Appellants' Reply Brief* at 9–11. The Burkes, however, were free to disclaim or renounce their beneficial interest in the Trust and avoid entirely the substantial tax consequences of inheriting between seven- and eight-million dollars. *See,*

*e.g.,* § Ind.Code Ann. 32–17.5 (Uniform Disclaimer of Property Interests Act) (West 2003). Instead, and contrary to their argument, the Burkes affirmatively sought to have the Bank Calumet stock transferred into Kathy Burke's name upon Meyer's death.

**5.** The trial court also noted that even though the Burkes represented that no attorney's fees were due to the Law Firm under the Agreement, the Burkes had taken an inconsistent position in the Cleland Litigation when they sought to recover attorney's fees incurred "in a sum not less than Three Hundred Thousand Dollars ($300,000)." *Appellants' Brief* at 50.

evidence, the trial court found the Burkes had terminated the relationship and awarded the Law Firm the dividends as provided by the Agreement's early-termination provision. We believe that the evidence supported the trial court's finding that the Burkes terminated the Agreement, and the finding supported judgment in the Law Firm's favor.

■ The Burkes also contend that the trial court's calculation of the amount of attorney's fees owed to the Law Firm was inaccurate. In particular, they allege that the trial court erred in using May 2000, rather than March 2000, as the "date of dismissal" per the Agreement's early-termination provision, and improperly ignored Scot Burke's testimony that no Bank Calumet dividends were paid from February 2000 to March 2000. Applying the two-tiered review of the trial court's findings and conclusions, we evaluate whether the evidence supported the findings and judgment.

At trial, the Burkes introduced the Law Firm's March 13, 2000 letter written shortly after the summary judgment hearing in the Cleland Litigation and after the Burkes informed Zromkoski that the Law Firm was "fired." The letter proposed that the Law Firm continue as counsel of record until a ruling on the summary judgment motion and withdraw ten days after such time unless the Burkes suggested otherwise. The Burkes did not. After the Cleland Litigation summary judgment ruling in the Burkes' favor, on May 15, 2000, Scot Burke directed the Law Firm to withdraw its appearance immediately. The trial court granted the Law Firm's Motion to Withdraw on May 19, 2000, and the Law Firm's representation of the Burkes ended. Based on this withdrawal date, the

trial court found that the "dismissal date" for purposes of calculating fees for the early-termination provision was May 2000. As the trial court stated in its findings of fact, the Law Firm "appropriately only withdrew its representation when doing so would not cause harm to its clients (or former clients)," and when directed to do so by the Burkes. *Appellee's Appendix* at 47. Therefore, use of the May 2000 date for purposes of calculating the attorney's fees was supported by the evidence and not clearly erroneous.

We also find no merit in the Burkes' argument that the amount of dividends was incorrectly calculated based on Scot Burke's testimony that no dividends were paid in February or March 2000. At trial, the Burkes introduced testimony of Stephen Ziemba, a Bank Calumet Trust Officer. During cross-examination, Ziemba testified that the dividends received from the Bank Calumet stock between September 1997 and May 2000 totaled $825,436.00:

> [Law Firm]: Did I ask you, sir, to make a computation as to the dividends received for a period of time?
>
> [Ziemba]: Yes.
>
> [Law Firm]: By the Trustee?
>
> [Ziemba]: Yes.
>
> [Law Firm]: That period of time was September, 1997 to May of 2000; is that correct?
>
> [Ziemba]: Correct.
>
> [Law Firm]: Did you do that?
>
> [Ziemba]: Yes.
>
> [Law Firm]: How much were those dividends?
>
> [Ziemba]: Approximately—well, a little over $825,000.

Moreover, the Burkes used this position to their advantage in negotiating settlement with the Cleland family.

[Law Firm]: Can we be specific and say, perhaps, $825,436?

[Ziemba]: Yes.

*Transcript* at 70–71. Scot Burke, however, testified that no dividends were paid in February or March 2000, and therefore, argued that, the trial court's use of $825,436.00 to calculate attorney's fees was in error. The trial court's reliance upon the testimony of a Bank Calumet Trust Officer rather than the self-serving calculation of a party-litigant was not erroneous, and the amount of dividends against which the Law Firm could claim a fee was properly calculated.

■ Finally, the Burkes argue they were not paid any dividends from September 1997 to May 2001 as the Trustee received all such dividends pursuant to the loan. The loan was occasioned by the liability for death taxes. The ultimate burden of the taxes fell upon the Burkes. The dividends in question were used to pay the loan and loan interest. Therefore, the dividends inured to the benefit of the Burkes and were *effectively* received by them although not paid directly to them. The Burkes also claim that attorney fees could not be properly computed upon the dividends because the court in 1997 ordered that the bank stock not be transferred to the Burkes and they were not therefore entitled to dividends while the Cleland Litigation was pending. Again, the accruing dividends during that period were used to pay the death taxes and therefore inured to the benefit of the Burkes even though they were precluded by the court order from directly receiving the dividends.

### 3.

■ Finally, the Burkes claim that the trial court's interpretation of the Agreement was unreasonable and resulted in an unconscionable judgment. The interpretation and construction of contract provisions is a function for the courts. *Ogle v. Ogle,* 769 N.E.2d 644 (Ind.Ct.App.2002). Upon appeal, we will employ the same standard of review as applied by the trial court, that is, unless the terms of the contract are ambiguous, they will be given their plain and ordinary meaning. Where the terms of a contract are clear and unambiguous, the terms are conclusive, and we will not construe the contract or look to extrinsic evidence, but will merely apply the contractual provisions. The terms of a contract are not ambiguous merely because the parties disagree as to the proper interpretation of the terms. *Id.*

The Burkes argue that the trial court's interpretation of the Agreement was unreasonable and the result unconscionable because the Law Firm received more attorney's fees under the early-termination provision than it would have received had the Burkes *not* terminated the Agreement. Under the Agreement, if the Law Firm had represented the Burkes through successful conclusion of the Cleland Litigation the Law Firm was entitled to fifteen percent "of the value of the Bank Calumet Stock that the Burkes receive after the payment of taxes." *Appellants' Appendix* at 4. At trial, Scot Burke testified that under this provision, the Law Firm would have earned only $268,660.00, rather than $330,171.00.[6] Thus, the Burkes claim that:

---

**6.** We question the reliability of the Burkes' mathematical calculation. As stated by the Law Firm:

The Burkes deduct purported capital gains from the amount on which the 15% fee would have been calculated. Yet, there is

absolutely no evidence in the record to support the assertion made by the Burkes that there *"were* capital gains taxes regarding the sale of stock which would have been assessed against the Burkes ..."* (Appellant's [sic] Br., p. 37) [emphasis added].

"It is unconscionable for the Trial Court to interpret a contract that would allow a Law Firm to receive more monies in attorney fees by not finishing the job than it would have received if it had finished and completed the task for which it received." *Appellants' Brief* at 38. We disagree.

As the Burkes themselves admit, "the clear and unambiguous language of the Employment Agreement between the parties does not create an unconscionable result or result in unconscionable terms." *Appellants' Brief* at 39. The contract contained two separate payment provisions— one if the Law Firm represented the Burkes to the successful conclusion of the Cleland Litigation, and a second if the Burkes terminated the Law Firm for reasons other than the Law Firm's failure to "diligently pursue the [Cleland Litigation]." *Appellants' Appendix* at 5. We interpret the second provision to protect the Law Firm in a situation like that presented here: where, after almost three years of substantial time and effort, the Burkes terminated the Law Firm after a considerable portion of work on the Cleland Litigation was completed, i.e., summary judgment was successfully achieved in the Burkes' favor. The Law Firm did not quit, nor did the Agreement permit the Law Firm recovery of any attorney's fees for quitting. Rather, the Burkes' termination of the Law Firm triggered application of the provision at issue. Further, we note both parties attest to the lengthy and detailed negotiations culminating in execution of the Agreement. The Agreement itself, and the trial court's interpretation of it, were reasonable and the judgment was conscionable.

Judgment affirmed.

RILEY, J., and SULLIVAN, J., concur.

### ORDER

The Appellee, by counsel, has filed a Motion for Memorandum Decision to be Issued as a Published Opinion. Counsel asks the Court to publish the decision handed down on November 26, 2003, pursuant to the guidelines set forth in Appellate Rule 65(A)(1) and (3).

Having reviewed the matter, the Court FINDS AND ORDERS AS FOLLOWS:

1. The Appellee's Motion to Publish is GRANTED, and this Court's opinion handed down on November 26, 2003, marked Memorandum Decision, Not for Publication is now ORDERED PUBLISHED.

FRIEDLANDER, SULLIVAN and RILEY, J.J., concur.

---

Scot Burke's own testimony at trial discredits the assertion that the Burkes make presently regarding capital gains tax. In response to a question during direct examination regarding the capital gains the Burkes had to pay on the Bank Calumet Stock, Scot Burkes clarified that he was referring to "capital gains I *would have* to pay on the stock *if* I sold it to pay off ... the estate tax." (Tr., p. 331) (emphasis added). However, Mr. Burke acknowledged at trial and during his deposition that he had not sold the Bank Calumet stock he had received to pay the estate tax, but rather has a loan. (Tr., p. 335; Appellee's App., pp. 126A–126B). *Appellee's Brief* at 27 n. 9.